1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VOLTAGE PICTURES, LLC,

        Plaintiff,

    v.

DOES 1 - 18,
DOES 1 - 78,
DOES 1 - 78,
DOES 1 - 22,
DOES 1 - 40,
DOES 1 - 52,
DOES 1 - 78,
DOES 1 - 18,

        Defendants.

Case No.  C13-0455MJP-RSL
Case No.  C13-0456RAJ-RSL
Case No.  C13-0457MJP-RSL
Case No.  C13-0458RAJ-RSL
Case No.  C13-0459TSZ-RSL
Case No.  C13-0460RSM-RSL
Case No.  C13-0461RAJ-RSL
Case No.  C13-0462JLR-RSL

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE

These actions were filed on March 13, 2013.  Each of the Doe defendants is identified only by an IP address linked to the on-line sharing of the movie "Maximum Conviction."  Plaintiff asserts direct and contributory copyright infringement claims against each Doe defendant.  The Court granted plaintiff's motions to initiate early discovery from internet service providers in order to obtain information sufficient to identify the owner of each IP address.  During the two months in which these actions were pending, none of the defendants was served, nor did plaintiff amend its complaint to identify any of the Doe defendants.

       On May 10, 2013, the Court issued orders to show cause acknowledging

1   concerns regarding the propriety of joinder, the possibility that plaintiff was using the

2   judicial authority of the United States to wrest improvident settlements from *pro se*

3   litigants under threat of huge statutory penalties, and plaintiff's standing to pursue these

4   matters.  The Court stayed the above-captioned matters and required plaintiff to provide

5   copies of all written communications with the owners of the IP addresses, summaries of

6   all oral communications with those individuals, and proof that Voltage Pictures, LLC had

7   standing to sue for copyright infringement.  In addition, the Court ordered plaintiff to

8   show cause why these cases should not be dismissed for improper joinder and/or pursuant

9   to the Court's inherent authority to control its docket.  Having reviewed plaintiff's

10  response, the Court finds as follows:

11      **A.  Joinder**

12          Federal Rule of Civil Procedure 20(a)(2) imposes two specific requirements

13  for the permissive joinder of defendants.  First, the right to relief against defendants must

14  arise out of "the same transaction, occurrence, or series of transactions or occurrences."

15  Fed. R. Civ. P. 20(a)(2)(A).  Second, there must be some question of law or fact common

16  to all defendants. Fed. R. Civ. P. 20(a)(2)(B).  Taking the well-pled factual allegations of

17  the complaint as true and considering the declarations of plaintiff's investigator, the Court

18  finds that these requirements are easily met.  As to each separate lawsuit, plaintiff's

19  investigator found that a user of the IP addresses identified in the action possessed a

20  pirated copy of "Maximum Conviction," that each copy was a reproduction of the same

21  original, and that the user offered for download a portion of its pirated copy at the

22  investigator's request, contributing to a fully-playable version of the movie.  Depending

23  on how one characterizes this activity, plaintiff's claims for relief arise from either the

24  same transaction (*i.e.*, its investigator's successful download of a single copy of

25  "Maximum Conviction") or a related series of transactions (*i.e.*, the incremental

26

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 2

1   downloads of portions of the movie from each identified IP address).  Litigating the cases

2   will also involve common questions of fact and/or law regarding the existence of a

3   swarm, the alleged downloads, plaintiff's ownership of the copyright, and the elements of

4   infringement.  The fact that persons associated with the IP addresses may have individual

5   defenses to plaintiff's claims does not change the fact that there will be some common

6   questions of law or fact:  not all of the legal and factual issues must be identical as to all

7   defendants.  <u>Patrick Collins, Inc. v. Does 1-21</u>, 282 F.R.D. 161, 168 (E.D. Mich. 2012).

8         Although the specific requirements of Rule 20 are met, the Court must also

9   determine whether permissive joinder will "comport with the principles of fundamental

10   fairness."  <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1296 (9th Cir. 2000).  Factors

11   relevant to this determination include the possible prejudice to any party, delay caused by

12   joinder, the motives for joinder, the closeness of the relationship between the joined

13   parties, notice to the parties, and the effect of joinder on jurisdictional issues.  <u>Desert</u>

14   <u>Empire Bank v. Ins. Co. of N. Am.</u>, 623 F.2d 1371, 1375 (9th Cir. 1980).  In the Ninth

15   Circuit, "[w]e start with the premise that Rule 20 . . . is to be construed liberally in order

16   to promote trial convenience and to expedite the final determination of disputes, thereby

17   preventing multiple lawsuits."  <u>League to Save Lake Tahoe v. Tahoe Reg'l Planning</u>

18   <u>Agency</u>, 558 F.2d 914, 916-17 (9th Cir. 1977).

19         Jointly litigating the facts related to the eight swarms plaintiff has identified

20   and the legal issues related to infringement is more efficient for plaintiff and the Court

21   than litigating hundreds of suits involving only one IP address each.  In addition, the

22   nature of the swarm and the BitTorrent protocol, with its many pieces and multiple

23   sources, suggests that joint litigation may be necessary for plaintiff to substantiate its

24   theory that defendants acted in concert to download copyrighted material, even if the

25   segment downloaded from a particular defendant, considered alone, might not constitute

26

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 3

copyright infringement.  Defendants, on the other hand, gain no appreciable advantage

through individual litigation:  in either case, defendants will be able to offer individual

defenses to the allegations.  Nor does there appear to be any significant risk of liability by

association.[1]  Jointly litigating these claims also allows defendants, many of whom will

undoubtedly proceed *pro se*, to pool resources, rely on arguments raised by other

defendants, and/or benefit from the participation of retained counsel.  The only potential

advantage to severance appears to be the hope that plaintiff will give up its claims, no

matter how meritorious, in the face of mounting costs.  If, as the Court is willing to

assume at this stage in the proceeding, plaintiff's allegations are true and the copyright

has been infringed, such a result is neither just nor fair.

The Court further finds that there is no indication that joinder will impact

the Court's subject matter jurisdiction and that defendants' alleged participation in a

knowing and intentional file-sharing scheme constitutes interrelated acts justifying joint

litigation even if defendants remained unaware of the identity of their fellow BitTorrent

users.

The Court is, however, concerned about the impact that joinder has had on

the handling of related litigation and how that handling reflects on plaintiff's motives for

amassing the groups of defendants in these cases.  To be clear, the Court finds that joinder

under Rule 20 for purposes of prosecuting copyright infringement claims against

members of a swarm in a single lawsuit can be appropriate.  There is no indication,

however, that plaintiff was actually prosecuting any of these actions.[2]  Despite receiving

---

[1] Contra Voltage Pictures, LLC v. Does 1-12, No. 2:13-292-AA, 2013 WL 1900597 (D. Or. May 4, 2013) (finding availability of statutory damages and potential that unintentional infringers could be prejudiced by being sued along with original seeder and/or serial infringers precludes joinder).

[2] In response to the various orders to show cause issued in this and the related copyright infringement cases, counsel provided virtually identical memoranda and declarations, making it impossible to determine exactly what steps plaintiff took to prosecute these particular actions or what

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 4

1    identifying information regarding some of the individuals associated with the IP

2    addresses at issue, plaintiff failed to affect service, asserting that complications in

3    obtaining subscriber information regarding every IP address somehow prevented it from

4    naming any individual defendants.  This approach to litigation has caused delay and raises

5    all sorts of potential for abuse, as discussed more fully below.  In addition, the failure to

6    prosecute the actions suggests that the motive for joinder is not to promote the underlying

7    goals of efficiency, justice, and expeditious resolution of the disputes, but rather to use

8    the pendency of this litigation to obtain unilateral discovery regarding non-parties and to

9    push for quick (and potentially unjustified) settlements.

10          In the circumstances of this litigation, the Court finds that joint litigation

11    against numerous participants in a single swarm satisfies the specific requirements of

12    Rule 20(a)(2) but that the joinder has been used to create a procedural imbalance which,

13    left unchecked, would not comport with the principles of fundamental fairness.

14    **B.  Lack of Service**

15          Pursuant to Fed. R. Civ. P. 4(m), "[i]f a defendant is not served within 120

16    days after the complaint is filed, the court – on motion or on its own after notice to the

17    plaintiff – must dismiss the action without prejudice against that defendant or order that

18    service be made within a specified time."  The time for service has now passed, but

19    plaintiff had approximately two months left on the service clock when the above-

20    captioned matters were stayed.  There is no reason to assume that timely service would

21    have been affected, however.  Months after these cases were filed, no proofs of service

22    were on record (as required by Rule 4(l)), and plaintiff had not moved to amend its

23    complaints to identify any of the Doe defendants.  Given the manner in which counsel

24    _____

25    communications were had with one or more of the Doe defendants in these eight cases.  The Court will
      therefore assume that counsel took the exact same steps and engaged in the same types of
26    communications with regards to all of the pending cases.

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 5

1  prosecuted the R&D Film 1 and Flypaper Distribution cases, it appears that plaintiff
2  intended to pursue discovery and settlement negotiations without serving any defendants.

3          As subscribers became aware of the lawsuits, they predictably began calling
4  plaintiff's counsel in order to obtain information.  Counsel apparently referred them to a
5  webpage of "Frequently Asked Questions," invited them to prove their innocence, and/or
6  negotiated settlements.  In addition, counsel sent demand letters to a handful of
7  defendants in these cases.  Despite the Court's instruction, plaintiff has not provided
8  copies of the demand letters and has not summarized its oral offers of settlement.  The
9  Court is therefore left to guess regarding the tenor and accuracy of statements made to
10  potential defendants.  The little information available to the Court is not reassuring.

11          Counsel's "educational FAQ website" is found at
12  www.fronteirlawgroup.wordpress.com and attached to this Order as Exhibit A.  The first
13  question is "Why am I being sued?"  Of course, the individual reading the FAQs has not
14  yet been sued, and plaintiff does nothing to clarify the procedural posture of the case.
15  The second question is about the justification for the settlement demand amount, but
16  plaintiff has provided very little information regarding oral or written settlement demands
17  in the above-captioned matters.  The FAQs themselves are silent on this issue, although
18  they do mention the maximum statutory penalties and a $675,000 jury verdict in a
19  copyright infringement action in the District of Massachusetts.  Plaintiff's advice
20  regarding the association of counsel (the court will not appoint counsel in a civil suit) and
21  the validity of possible defenses (failure to password protect and/or monitor the use of
22  your internet connection may constitute negligence) is suspect.  Finally, plaintiff invites
23  the individual reading the FAQs to provide evidence proving that he or she did not
24  download "Maximum Conviction."

25          When plaintiff sought permission to conduct discovery in these cases, it
26

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 6

represented the discovery as both limited and efficacious:  by subpoenaing subscriber

identification information from the ISPs, plaintiff would be able to pursue these lawsuits

and protect its copyrights.  It turns out, however, that identifying the account holder tells

us very little about who actually downloaded "Maximum Conviction" using that IP

address.  As one court noted, "it is no more likely that the subscriber to an IP address

carried out a particular computer function . . . than to say an individual who pays the

telephone bill made a specific telephone call."  In re BitTorrent Adult Film Copyright

Infringement Cases, 2012 WL 1570765, at *3 (E.D.N.Y. May 1, 2012).  In fact, it is less

likely.  Home wireless networks are ubiquitous, meaning that a single IP address can

simultaneously support multiple computer devices throughout the home and, if not

secured, additional devices operated by neighbors or passersby.  Thus, the risk of false

positives is very real.  Digital Sin, Inc. v. Does 1-176, 279 F.R.D. 239, 243 (S.D.N.Y.

2012).  It is not clear that plaintiff could, consistent with its obligations under Fed. R. Civ.

P. 11, make factual contentions regarding an internet subscriber's infringing activities

based solely on the fact that he or she pays the internet bill.  Plaintiff seems to be aware of

this problem and has refrained from identifying the Doe defendants more specifically

even after it learns the name of the subscriber.  Plaintiff does not, however, take the

appropriate steps of returning to the Court to seek an extension of time in which to serve

and permission to conduct additional discovery.  Rather, plaintiff demands that the

subscriber prove he or she did not download "Maximum Conviction."  Therein lies the

rub.  Plaintiff has effectively obtained access to unrepresented individuals and parleyed

that access into open-ended and unlimited discovery, despite the very narrow discovery

order entered by the Court.

        In this context, the 120-day service deadline is the only thing that limits

plaintiff's unsanctioned discovery expedition.  If plaintiff feels it has enough information

to satisfy its Rule 11 requirements by simply identifying the subscriber associated with an IP address, it should serve the complaint and initiate litigation subject to the limitations imposed by the rules of civil procedure.  If, on the other hand, plaintiff would have trouble justifying a factual contention that the internet subscriber must, by virtue of that fact, be the downloader, it could seek an extension of the service deadline, explaining why it was unable to obtain the information in a timely manner and identifying steps to be taken that would allow litigation to begin.  If those steps include additional discovery, further permission of the Court would be necessary.

In short, plaintiff must actually prosecute the claims it has asserted.  Instead, plaintiff's litigation strategy seems to be to use the mere pendency of these actions to create a period of time in which it can scare subscribers into settlement as the only means of avoiding both litigation costs and harsh statutory penalties.  The limited communications disclosed to the Court show that plaintiff makes every effort to "educate" the subscriber regarding the statutory penalties he or she faces.  Coupled with the clear implication that evidence of IP address ownership is legally sufficient to establish copyright infringement and the demand that the subscriber prove his or her innocence, it is not surprising that subscribers – whether guilty or not – may choose to settle.  While the risk of improvident settlements and overreaching cannot be eradicated, the Court will not allow plaintiff to pick and choose the procedural rules it likes while ignoring deadlines and discovery limitations.  Absent extraordinary and unforeseeable circumstances, the service deadline will be strictly enforced in order to reduce the risk of overreaching.

**C.  Standing**

When these actions were filed, plaintiff asserted that it was "the proprietor of all right, title, and interest in the Copyright" based on a July 12, 2012, Certificate of Registration and an "Assignment of Copyright Interest."  The Certificate is *prima facie*

1  evidence that another entity, Maxcon Productions, Inc., is the author of and copyright

2  claimant for "Maximum Conviction."  United Fabrics Int'l, Inc. v. C&J Wear, Inc., 630

3  F.3d 1255, 1257 (9th Cir. 2011).  Plaintiff contends, however, that the Assignment

4  conveyed all Maxcon Production's rights and interests in the movie to plaintiff, Voltage

5  Pictures, LLC.  This argument is not supported by the facts or the law.  Contrary to

6  plaintiff's truncated (and rather deceptive) quotation from the Assignment (Plaintiff's

7  Response to Order to Show Cause at 15), the only rights and interests transferred to

8  plaintiff are those "necessary to make claims by itself against illegal downloads, uploads,

9  and/or streaming the work via the internet or wireless worldwide and to undertake such

10  actions as it believes necessary or appropriate to protect against piracy of any of the rights

11  in the Work . . . ."  The purported transfer is ineffective:  "the assignment of a bare right to

12  sue for infringement, without the transfer of an associated exclusive right, is impermissible

13  under the Copyright Act and does not confer standing to sue."  Righthaven LLC v. Hoehn,

14  716 F.3d 1166, 1169 (9th Cir. 2013) (citing Silvers v. Sony Pictures Entm't, Inc., 402 F.3d

15  881, 890 (9th Cir. 2005)).

16            In response to the Order to Show Cause, plaintiff now asserts that it obtained

17  standing to sue through a 2011 Sales Agency Agreement.  The Copyright Act permits only

18  the "legal or beneficial owner of an exclusive right under a copyright" to bring suit for

19  infringement.  17 U.S.C. § 501(b).  The six exclusive rights set forth in the Copyright Act

20  are:

21       (1)  to reproduce the copyrighted work in copies or phonorecords;

22       (2)  to prepare derivative works based upon the copyrighted work;

23

24       (3)  to distribute copies or phonorecords of the copyrighted work to the public by
              sale or other transfer of ownership, or by rental, lease, or lending;

25

26       (4)  in the case of literary, musical, dramatic, and choreographic works,

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 9

pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

   (5)  in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to display the copyrighted work publicly; and

   (6)  in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.  Whether the Sales Agency Agreement conveyed one or more of these exclusive rights to Voltage Pictures, LLC, is a close question.

     A transfer of copyright ownership under the Copyright Act means "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license."  17 U.S.C. § 101.  Pursuant to the Sales Agency Agreement, Maxcon Productions, Inc., the registered owner of the copyright, engaged Film Capital Europe Funds S.A. as an "authorized signatory, sales, collections and servicing agent" for "Maximum Conviction" in the United States.  Film Capital Europe was specifically given "all rights to exploit all linear versions of the Picture" in certain formats, including in video/DVD and over the internet.  Plaintiff Voltage Pictures, LLC, was designated as Film Capital Europe's sub-sales agent, thereby inheriting all of its obligations and liabilities under the Agreement.

     The geographic and format limitations in the Agreement would not prevent a finding that an exclusive right has been transferred to plaintiff.  As recognized in the legislative history of the current version of the Copyright Act, "a local broadcasting station holding an exclusive license to transmit a particular work within a particular geographic area and for a particular period of time, could sue, in its own name as copyright owner,

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 10

someone who infringed that particular exclusive right." H.R. Rep. No. 94-14763, at 123

(1976). "In other words, exclusive rights may be chopped up and owned separately, and

each separate owner of a subdivided exclusive right may sue to enforce that owned portion

of an exclusive right, no matter how small." Sybersound Records, Inc. v. UAV Corp., 517

F.3d 1137, 1146 (9th Cir. 2008).

Nevertheless, the Court is not currently in a position to determine whether

the Sales Agency Agreement transferred to plaintiff  legal or beneficial ownership of an

exclusive right (or an exclusive portion of such a right) pertaining to the copyright.  The

interpretation of the Sales Agency Agreement is governed by state law contract principles.

Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 827 (9th Cir. 2001).  Assuming

that the Agreement's choice of California law applies, the Court is to give effect to the

mutual intention of the contracting parties at the time of contracting based on the language

of the contract as a whole, the ordinary meaning of the words used, and the circumstances

under which the contract was made.  Cal. Civ. Code §§ 1636, 1639, 1641, 1644, and 1647.

"If contractual language is clear and explicit and does not involve an absurdity, the plain

meaning governs." Windsor Pac. LLC v. Samwood Co., Inc., Cal. Rptr.3d 518, 528 (Cal.

Ct. App. 2013).  Given these rules of construction, the Sales Agency Agreement could, as

its name suggests, merely establish the existence and boundaries of an agency relationship

between the parties.  The Agreement specifically authorizes Film Capital Europe to act as

Maxcon Productions' agent with regards to signing distribution agreements, selling/

leasing/promoting the movie, collecting royalties, and pursuing infringers.  Film Capital

Europe, while given the right to "exploit all linear versions of the Picture" in the United

States, is not designated as a licensee and is, instead, authorized to negotiate and execute

third-party licenses related to the linear versions on behalf of Maxcon Productions.  For its

services, Film Capital Europe was entitled to recoup any third-party expenses it incurred

and to keep a percentage of the gross receipts collected.[3]  In the alternative, the Sales

Agency Agreement could be interpreted as granting Voltage Pictures, LLC, through Film

Capital Europe, an exclusive license to reproduce and distribute "Maximum Conviction"

within a defined territory.  Although plaintiff has not provided evidence on the issue, there

may be support for this interpretation in the circumstances surrounding the contract's

negotiation and industry practices.  The fact that the Agreement lacks a definitive term

transferring a copyright interest and/or designating plaintiff as an exclusive licensee is not

definitive: "even though a written instrument may lack the terms 'transfer' and

'copyright,' it may still suffice to evidence [the parties'] mutual intent to transfer the

copyright interest."  3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright

§ 10.03[A][2] (Rev. Ed. 2013).  It is the mutual intent of the parties, in light of the

language of the Agreement and the surrounding circumstances, that must govern.

        The party that brings a cause of action in federal court has the burden of

proving that it has standing to pursue its claims.  Doran v. 7-Eleven, Inc., 524 F.3d 1034,

1049-50 (9th Cir. 2008).  Although plaintiff's evidence of ownership of a legal or

beneficial interest in the copyright at issue is equivocal, the argument is plausible.  At this

point in the litigation, the Court is not willing to conclusively interpret the Sales Agency

Agreement or to make a final determination regarding plaintiff's standing to sue.  This

same issue is being raised in other litigations around the country (see Minden Pictures, Inc.

v. John Wiley & Sons, Inc., 2013 WL 1995208, at *3 (N.D. Cal. May 13, 2013)) and

should be decided on a more complete record and with the participation of the opposing

parties. This issue will, therefore, be deferred until it can be subjected to meaningful

---

[3] Interpreting the Sales Agency Agreement as a contract establishing the existence and
boundaries of an agency relationship is also supported by the fact that the parties felt it necessary to
subsequently enter into a separate "Assignment of Copyright Interest" in order to give Voltage Pictures,
LLC, the power to pursue infringement actions.

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 12

adversarial testing.

For all of the foregoing reasons, the stay of the above-captioned cases is hereby lifted and plaintiff may again pursue identifying information regarding the Doe defendants from the ISPs pursuant to the Court's prior discovery order.[4]  Plaintiff shall have sixty-five days from the date of this Order to complete discovery and affect service. Failure to file proof of service on or before the sixty-fifth day will result in the dismissal of plaintiff's claims as to each unserved defendant.  The Court takes under advisement issues regarding ownership of the copyright and/or plaintiff's failure to provide complete information regarding communications with subscribers.

Dated this 7th day of August, 2013.

*MRT S Lasnik*

Robert S. Lasnik
United States District Judge

---

[4]  Doe 35's request for oral argument (Dkt. # 11) is DENIED.

ORDER LIFTING STAY AND
EXTENDING SERVICE DEADLINE - 13